**UNITED STATES of America, Plaintiff,**

v.

**SOLAR TURBINES, INC., Defendant.**

**Civ. A. No. 88–0924.**

United States District Court,
M.D. Pennsylvania.

Nov. 28, 1989.

Robert J. DeSousa, U.S. Attorney's Office, Scranton, Pa., Ralph H. Lendeman, U.S. Dept. of Justice, Land & Natural Resources, David Novello, Office of E.P.A., Washington, D.C., and Leslie Anne Guinan, Office of Regional Counsel, U.S. E.P.A., Philadelphia, Pa., for plaintiff.

Terry R. Bossert, McNees, Wallace & Nurick, Harrisburg, Pa., and Scott M. Turner and Harold A. Kurland, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., for defendant.

MEMORANDUM

RAMBO, District Judge.

This is a civil enforcement action by the United States at the request of the Environmental Protection Agency (EPA) under the Clean Air Act (CAA), sections 113(b) and 167, 42 U.S.C.S. §§ 7413(b), 7477 (Law. Co-op.1989) against Solar Turbines, Inc. (Solar). Subject matter jurisdiction exists under those Act sections and 28 U.S.C. sections 1331, 1345, and 1355. Both parties have moved for summary judgment pursu-

ant to Rule 56 of the Federal Rules of Civil Procedure.

Summary judgment is warranted when pleadings, affidavits and other materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." It is this court's responsibility to determine whether there exists a genuine and material issue of fact. In making the decision "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)).

*Background*

Before setting forth the facts underlying this case, an overview of relevant Act provisions is necessary. The Clean Air Act provides that "[e]ach State shall have the primary responsibility for assuring air quality [within the state] by submitting an implementation plan for each State...." CAA, § 107, 42 U.S.C.S. § 7407(a). This state implementation plan (SIP) must categorize regions within the state according to their level of air quality for various pollutants. An area that has attained a required level for a pollutant is characterized as an "attainment" or "clean air area" for that pollutant. *Id.* § 107(d)(1)(E), 42 U.S. C.S. § 7407(d)(1)(E). EPA must approve a proposed SIP when it determines the state plan was adopted after proper notice and hearing and provides sufficient mechanisms by which air quality requirements can be attained. Relevant to this case, the plan must include a permit program in accordance with Part C of the Act which deals with the prevention of significant deterioration (PSD) of air quality in a region that has been categorized attainment for a particular pollutant. *Id.* §§ 110(a)(2)(D), (J), 160–169; 42 U.S.C.S. §§ 7410(a)(2)(D), (J), 7470–7479. Section 165(a) of Part C requires that

> [n]o major emitting facility ... may be constructed [in a clean air area] unless—
> (1) a permit has been issued for such

proposed facility ... setting forth emission limitations for such facility which conform to the requirements of this part; ... (4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from such facility.

Best available control technology (BACT) is defined at section 169(3), 42 U.S.C.S. § 7479(3) as

> an emission limitation based on the maximum degree of reduction of each pollutant subject to [Part C] ... emitted from ... any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility.... In no event shall application of [BACT] result in emissions of any pollutants which will exceed the [new source performance standard].

A federal regulation reiterates this definition. 40 C.F.R. § 52.21(b)(12) (1988).

Pennsylvania submitted a plan which EPA accepted as meeting the CAA requirements, including those for the PSD permitting program. *See* 49 Fed.Reg. 33127 (Aug. 21, 1984) (adding 40 C.F.R. § 52.2020(c)(57) (1988)). As an approved state, Pennsylvania became the permit issuing authority for facilities within the state. The Pennsylvania PSD permit program in essence adopts the federal PSD permit issuance program. 25 Pa.Code §§ 127.81 to –.83. Section 127.83 incorporates by reference federal regulations promulgated at 40 C.F.R. § 52.21.

These federal, and hence state, provisions in turn set forth the duties that EPA, its regional offices, and owner/operator permit applicants have within the PSD program. Duties of owners/operators include the following. First, they may not begin actual construction on a facility unless they have a permit stating the facility will meet the section's requirements. 40 C.F.R. § 52.21(i)(1). These requirements, spelled out in paragraphs (j) through (r), include: (1) a duty to meet SIP emission limitations as well as federally established standards

under 40 C.F.R. Parts 60 and 61, 40 C.F.R. § 52.21(j)(1); (2) a duty to apply BACT, *id.* § 52.21(j)(2); (3) a duty to demonstrate the construction will not result in any violation of national air quality standards or regional allowances for increases over baseline amounts, *id.* § 52.21(k); (4) a duty to include preapplication analyses of specified kinds and to provide for postconstruction monitoring, *id.* § 52.21(m); (5) a duty to provide certain specified information and any other information the permitting authority requests regarding the source, *id.* § 52.21(n), and additional "impact" analyses, *id.* § 52.21(*o*). *See also Alabama Power Co. v. Costle,* 636 F.2d 323, 351–52 (D.C.Cir.1979).

Section 52.21(r), entitled "Source obligation," delineates grounds on which "appropriate enforcement action" may be taken against an owner/operator who is subject to Part C of the Act. These specific owner/operator violations are (1) constructing or operating the source in a manner "not in accordance with the application submitted pursuant to ... section [52.21] or with the terms of any approval to construct ..." or (2) beginning "construction ... without applying for and receiving approval...." 40 C.F.R. § 52.21(r).

The Pennsylvania PSD plan obligates the Pennsylvania Department of Environmental Resources (PADER) as the state agency responsible for the permit program to comply with appropriate regulations set forth at 40 C.F.R. Part 124 or at 40 C.F.R. § 52.21(r) when Part 124 does not apply. *See* 40 C.F.R. § 52.21(q) ("Public participation"). Part 124 provides additional information about source obligations. It requires the owner/operator of a source to provide the issuing agency (PADER) with requested information so that the agency may create a complete record. Specific enforcement authority is granted pursuant to section 167 of the CAA for failure to provide that information. 40 C.F.R. Part 124.3(c), (d). Section 167 states that "[t]he Administrator [of EPA] shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction of a major emitting facility, which does not conform to the requirements of this part,...."

The EPA Administrator may also pursue action under section 113, the Act's general enforcement provision. Civil penalties, such as what EPA seeks in this action, may be issued when a source violates an administrative order from EPA; a requirement of an applicable SIP after having had thirty days warning of that violation; recordkeeping, inspection or monitoring requirements; or when after a finding has been made that a state is not acting in compliance with the Act's *non* attainment provisions, an owner/operator persists in attempting to construct in violation of that finding. CAA § 113(b), 42 U.S.C.S. § 7413(b). The Administrator of EPA may issue an order when he finds that a "person is in violation of any requirement of an applicable implementation plan." Section 113(a)(1), (b)(1), 42 U.S.C.S. § 7413(a)(1), (b)(1). A section 113 order may not be issued until the purported violator has had the "opportunity to confer with the Administrator" about the violation. The order must be reasonably specific about the nature of the violation and provide a deadline for compliance. *Id.,* § 113(a)(4), 42 U.S.C.S. § 7413(a)(4). Sections 113(b) and 167 are the CAA enforcement provisions under consideration in this action.

*Factual Background*

Although much of the relevant background has been set forth in *Solar Turbines, Inc. v. Seif,* 879 F.2d 1073, 1075–76 (1989) (cross-appeals from district court order concerning stay of EPA enforcement action and its decision whether the EPA administrative order constituted final agency action), it will be reiterated here. Solar applied for a PSD permit from the PADER in September 1986 to construct a gas turbine cogeneration facility in York County, Pennsylvania. No party contests this proposed construction placed Solar within the scope of Part C for nitrogen oxide. Nor does the government contend that Solar did not provide PADER with required information and data on net emissions, the different air standards, monitoring of emissions, and PSD/BACT requirements in its applica-

tion. After Solar submitted its application, PADER made several requests of Solar for additional information with which Solar complied. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Summary Judgment (Plaintiff's Memorandum), Affidavits and Appendix (Plaintiff's Appendix) at Appendix nos. 3, 4.[1]

In July 1987 PADER informed EPA of its preliminary decision to grant Solar a PSD permit authorizing Solar's turbine design as the BACT. The proposed permit did not impose a water or steam injection technology to limit nitrogen oxide emissions, although such a technology was technologically feasible. Plaintiff's Appendix no. 16. EPA submitted responses to PADER's announcement and specifically addressed BACT. Plaintiff's Appendix no. 17. Solar reacted to EPA's comments concerning BACT in a written letter and PADER held a meeting to further discuss the BACT for the project. Plaintiff's Appendix nos. 18, 21. PADER subsequently granted final approval on September 9, 1987 for Solar to construct the turbines in accordance with Solar's application. The application statement that "[t]he state-of-the-art of the Solar Turbines is that their design is considered BACT for NOx, and that no additional controls are required" was therefore activated. Plaintiff's Appendix no. 1 at 4. The permit did not require water or steam technology as BACT.

At the end of January 1988, EPA issued a section 167 administrative order to Solar in which it stated that the PADER-issued permit did not comply with CAA section 165(a)(4), 42 U.S.C.S. § 7475(a)(4). The EPA order directed Solar to cease all construction and/or operation of the turbine. Solar sought injunctive and declaratory relief against the order in a complaint filed in February 1988 in this district. Following a series of procedural maneuvers, the court ultimately granted an EPA motion to dismiss the Solar action. *See Solar*, at 1076. EPA then withdrew its January 1988 order

and filed an action under section 167 of the Act, 42 U.S.C.S. § 7477 for injunctive relief to prevent the turbine construction. The section 167 action is the focus of this case. The court subsequently granted EPA leave to amend the complaint to add a claim for civil penalties under section 113(b) when Solar did not comply with the EPA order after thirty days notice of the stated violation.

It is EPA's position that "PADER had no adequate justification for its failure to require available emission controls for oxides of nitrogen in the PSD permit issued to Solar." First Amended Complaint ¶ 16. As a result, EPA asserts this failure violates sections 165(a)(4) and 169 of the CAA, defining BACT, and 25 Pa.Code sections 127.81 to −.83 which incorporate the federal permit plan. *Id.* ¶ 17. These violations render the permit PADER issued to Solar invalid. *Id.* § 18. Because the permit is not valid, Solar is in violation of section 167's proscription against acting "out of conformance with the provisions of Part C." EPA states injunctive relief is necessary to prevent Solar's violation of BACT provisions by constructing with an invalid permit. *Id.* ¶ 21. EPA further asserts section 113(b) civil penalties are warranted because Solar failed to cease construction within thirty days of EPA's January 1988 notice of violation. *Id.* ¶¶ 23–25.

The Act does not specifically address whether the enforcement powers of section 167 extend to preventing a source from constructing after it has received a permit from a properly authorized agency but when the EPA contests the permit as being improperly issued. Neither party is able to cite case law on this issue, and therefore they resort to legislative history and other provisions of the Act to support their opposing positions on the legitimacy of EPA's actions. When a "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the Agency's answer is based on a permissible construction of the statute." *Chevron,*

---

**1.** Solar submitted additional or modified BACT information to PADER on other occasions. *See* Plaintiff's Appendix at nos. 5, 6, 7. The state also developed some BACT data on its own. Plaintiff's Appendix nos. 8, 10, 11.

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Reasonable interpretations of the agency administering the statute are to be upheld. *Id.* at 859–66, 104 S.Ct. at 2790–93.

Under that standard, and recognizing the deferential attitude that courts generally take toward agency interpretations, this court holds that EPA's interpretation fails to meet the standard of reasonableness and that EPA can not as a matter of law pursue enforcement action against an owner/operator who has committed no violation that can be attributed to it other than to act in accordance with a permit it received from an authorized permit-issuing authority, but which permit EPA believes the issuing authority improperly granted.

The basic issue as this court views it is whether the "out of conformance" language in section 167 provides a basis to proceed against Solar. The government cites to several comments contained within the legislative history to support its action against Solar. However, those statements, being very general ones regarding enforcement action, must be read in the context of the other enforcement provisions of the CAA and the federal regulations that implement the CAA. These support the position which underlies EPA's stance that before an enforcement action may be undertaken there must be a violation. EPA would have this court hold, however, that it is a violation for an owner/operator of a source to act on a permit that has been issued to it and which authorizes its action. This the court holds is unreasonable in light of the constraints on enforcement set forth in section 113, 40 C.F.R. § 52.21(r) and 40 C.F.R. § 124.3(c), (d). The thrust of all these provisions, described earlier, is that a violation is to be assessed against objective standards, namely the source's failure to apply for a permit or receive a permit prior to construction; failure to supply information requested of it by the issuing authority, or failure to comply with specific quantifiable air quality standards or restrictions on emission levels. These are the grounds on which enforcement actions against owner/operators have pro-

ceeded. For example, in *United States v. Louisiana–Pacific Corp.*, 682 F.Supp. 1122 (D.Colo.1987), EPA properly sought injunctive and civil penalties against a facility it believed came within the scope of Part C's permit requirement when the facility improperly believed it did not qualify as a major stationary source within Part C and therefore had not sought a permit. In *United States v. Chevron U.S.A., Inc.*, 639 F.Supp. 770 (W.D.Tex.1985), EPA's claims for civil penalties were granted against an oil company for exceeding emission limitations and modifying a facility without obtaining a permit.

Other sections of the CAA also support the stance that EPA's authority to charge a source with a violation under the Act is limited to violations of quantifiable emission standards. *See* § 111(e), 42 U.S.C.S. § 7411(e) (unlawful for owner/operator of new source to violate a standard of performance as defined in § 111(a)(1), 42 U.S. C.S. § 7411(a)(1)); § 112(c), 42 U.S.C.S. § 7412(c) (construction of new/modified source prohibited if it would cause violation of national hazardous air pollutant emission standard).

It is unreasonable to take the position that Congress would have so nonchalantly and vaguely provided for a drastic expansion of EPA enforcement action without explicitly setting forth this expansion and defining its scope. It is furthermore unreasonable to take the position that a source can be held directly liable for a decision which was not in its control to make. To accuse a source of a violation necessitates its ability to have avoided the violation or to have a means of complying with an administrative order so that it may correct the violation. EPA suggests that all Solar need do to comply is to reapply to PADER for a permit and "receive one that does conform to the BACT requirements of the Act." Plaintiff's Memorandum at 2 n. 2. PADER's violations are, however, outside the control of Solar.

In that EPA's action largely amounts to a veto of the permit Solar received, it is also instructive to note two situations where Congress provided EPA with specif-

ic veto authority over state issued permits. Within the Clean Water Act Congress provided states with authority to grant certain permits. Under that act a state must submit a copy of any proposed permit to EPA. EPA may bar issuance of the permit if the Administrator—within a specified time—objects in writing to the permit "as being outside the guidelines and requirements of [the Clean Water Act]." 33 U.S.C.S. § 1342(d)(2)(B). Congress chose that path over the alternative of allowing EPA to rely on its authority to withdraw approval of a state's entire program. *Natural Resources Defense Council, Inc. v. United States E.P.A.*, 859 F.2d 156, 184 (D.C.Cir. 1988).

A second example involves the federal regulations that implement civil penalty provisions under section 211, 42 U.S.C. § 7545 of the CAA, relating to the regulation of fuels. These regulations specify clear bases on which EPA may pursue enforcement action. *See* 40 C.F.R. § 22.13. None of the situations listed there as limits on EPA's authority exist here. The presence of these provisions lends further support to the unreasonableness of EPA's expansive interpretation of its authority under section 167. *Cf. Greater Detroit Resource Recovery Authority v. Adamkus*, 677 F.Supp. 521 (E.D.Mich.1986) (The State of Michigan's authorized permit-granting agency issued a permit to a facility. Later, having discovered information that rendered a different technology BACT, the state agency notified the facility that a new technology would be required as BACT in the future. EPA then informed the state that its BACT analysis had been inadequate for failure to provide a detailed analysis of alternatives. EPA subsequently revoked its PSD delegation with respect to that particular source, citing implied authority to revoke the permit under the CAA. The court held EPA had no such implied authority.).

EPA further argues that if its position is not accepted then section 167 will become a "largely useless and meaningless appendage" and that EPA will be without oversight ability in individual situations where the state has not complied with the Act.

This is clearly not the case, however. Indeed EPA admitted as much when it presented an alternative that was available to it, namely to have proceeded immediately against the state under section 167 after the state issued its final permit decision to Solar. EPA states it did not select this option because of a need to maintain harmonious state-federal relations.

In addition to section 167 action against the state EPA may well have had an option of pursuing a section 113 action against the state. The Sixth Circuit Court of Appeals held in *United States v. Ohio Dep't of Highway Safety*, 635 F.2d 1195, 1203 (6th Cir.1980), although dealing with motor vehicle provisions of the Clean Air Act, that EPA was not limited to using section 113(b)'s "widespread" state violation provision. The court found EPA had 113(a) available to it "when violations of an implementation plan result from failure of a state to carry out a duty imposed upon it by a plan." *Id.* at 1204.

It is apparent that Solar is caught in the midst of a conflict between PADER and EPA. Before enforcement action may be brought against Solar it is imperative that these two agencies resolve their differences concerning the proper method of conducting and supporting a BACT analysis. *Cf. United States v. Alcan Foil Products*, 694 F.Supp. 1280 (W.D.Ky.1988). Accepting EPA's position would not only be contrary to the general enforcement scheme in the Clean Air Act, but would also lay waste to a source's ability to rely on a permit it has been issued by an authorized state permitting agency.

In deciding as it has, the court expresses no opinion concerning EPA's stance on PADER's decision-making process or the adequacy of its record concerning the Solar permit. Defendant's motion for summary judgment will be granted and plaintiff's cross motion for summary judgment will be denied. An appropriate order will be issued.