State of ALASKA, DEPARTMENT OF ENVIRONMENTAL CON-SERVATION, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

Teck Cominco Alaska Incorporated, Petitioner,

v.

United States Environmental Protection Agency, Respondent.

Teck Cominco Alaska Incorporated, Petitioner,

v.

United States Environmental Protection Agency, Respondent.

Teck Cominco Alaska Incorporated, Petitioner,

v.

United States Environmental Protection Agency, Carol M. Browner, Administrator, and Chuck Clarke, Regional Administrator, Region 10, of the United States Environmental Protection Agency, Respondents.

Nos. 00–70166, 00–70169, 00–70175 and 00–70301.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 2001.

Submission Vacated March 27, 2001.

Resubmitted July 30, 2002.

Filed July 30, 2002.

Cameron M. Leonard, Assistant Attorney General, State of Alaska, Fairbanks, Alaska; Robert T. Connery, Holland & Hart, Denver, Colorado, for the petitioners.

Andrew J. Doyle, United States Department of Justice, Environmental Defense Section, Washington, D.C., for the respondents.

Before: REINHARDT, WARDLAW, and GOULD, Circuit Judges.

WARDLAW, Circuit Judge.

The Alaska Department of Environmental Conservation ("ADEC") and Teck Cominco Alaska, Inc. ("Cominco") petition for review of three enforcement orders

entered by the United States Environmental Protection Agency ("EPA"), which effectively invalidated a Prevention of Significant Deterioration ("PSD") permit issued by ADEC to Cominco. Petitioners challenge the EPA's authority to issue these orders, and argue that the EPA abused its discretion in finding that ADEC's Best Available Control Technology ("BACT") determination did not comply with the requirements of the Clean Air Act and Alaska's State Implementation Plan ("SIP"). We find that the EPA acted within its authority and, further, that it did not abuse its discretion.

## I. Background

The Clean Air Act ("the Act"), 42 U.S.C. §§ 7401–7671q, establishes a program for controlling and improving the nation's air quality through a system of shared federal and state responsibility. The Act requires states to submit for the EPA's approval a state implementation plan that provides for attainment and maintenance of the national ambient air quality standards ("NAAQS") promulgated by the EPA. 42 U.S.C. § 7410.

The Act's Prevention of Significant Deterioration program controls the level of degradation in "clean air areas" of the nation by requiring a pollutant-emitting source to obtain a permit before construction. See 42 U.S.C. §§ 7470–7492. In implementing the PSD program and permitting process, states can either operate within the federal PSD program, in which the EPA is the PSD permit issuer, or include a PSD program within their own EPA-approved state implementation plan. 42 U.S.C. §§ 7410(a)(2)(C), 7471.

Alaska is a "clean air area" under the Act—that is, its air quality regions are cleaner than the national standards with respect to ozone and nitrogen dioxide. Under Alaska's State Implementation Plan, which the EPA accepted as meeting the Act's requirements in 1983, Alaska, through the Alaska Department of Environmental Conservation, is the PSD permit issuer. See Approval and Promulgation of Implementation Plans; Alaska, 48 Fed.Reg. 30623 (July 5, 1983), as amended at 56 Fed.Reg. 19284 (April 26, 1991). For new and modified sources, the Alaska SIP requires "a demonstration that the proposed [emissions control] limitation represents the best available control technology" before ADEC will issue a permit. Alaska Admin. Code tit. 18, § 50.310(d)(3) (1997).

Cominco operates the Red Dog Mine facility ("the Mine"), a major producer of zinc concentrates, in partnership with the Northwest Arctic Native Association, an Alaska corporation. The Mine is approximately 100 miles north of the Arctic Circle and about five miles west of the Noatak National Preserve. The closest residential communities are the native villages of Kivalina and Noatak.

Due to its remote location, the Mine requires an independent, on-site power source. The current power supply for the Mine consists of six diesel-fired Wartsila 5000–watt generators, labeled "MG–1" through "MG–6," which were constructed under a 1988 PSD permit. In April 1996, Cominco began its Production Rate Increase ("PRI") project to boost the Mine's output of zinc and zinc concentrates. Cominco determined it needed more electricity at the Mine to power the additional mining equipment.

In June 1998, Cominco submitted an application to ADEC for a new PSD permit, requesting permission to increase the amount of nitrogen oxides ("NOx"), a regulated air pollutant, from its MG–5 generator. Cominco's application proposed the use of "Low NOx" as BACT for MG–5. Low NOx is a process that uses high-

combustion air temperatures to better atomize toxic particles, thereby reducing the amount of NOx released into the environment. A review by ADEC, however, reached the contrary conclusion that Selective Catalytic Reduction ("SCR"), a process in which exhaust is injected with ammonia or urea and then combined with a catalyst, was BACT for MG–5.

Cominco responded by amending its application in April 1999. As an alternative to installing SCR on MG–5, Cominco volunteered to install the less costly Low NOx technology on all six of its existing generators, including those not subject to BACT standards, and on a proposed seventh generator, "MG–17."

In its May 4, 1999 Preliminary Technical Analysis Report, ADEC accepted Cominco's proposal because it would reduce the total NOx output from the Mine to a level comparable to that which would result were SCR installed in only the MG–5 and MG–17 generators.

In July 1999, the EPA entered the discussion over Cominco's application at the urging of the National Park Service, which had expressed concern that the "[n]itrogen oxide emissions ... could affect vegetation at Cape Krusenstern National Monument and Noatak National Preserve." In a letter to ADEC, the EPA stated that SCR was the best available control technology for the MG–5 and MG–17 generators, and that "the PSD program does not allow the imposition of a limit that is less stringent than BACT even if the equivalent emission reductions are obtained by imposing new controls on other emission units."

On September 3, 1999, ADEC issued a Final Technical Analysis Report and permit decision, concluding that SCR was not economically feasible and that Low NOx was instead BACT. The EPA responded with a review of ADEC's report, asserting that ADEC's cost-effectiveness estimate

for SCR was "well within the range that the EPA considers reasonable," and that Cominco had not adequately demonstrated why SCR was economically infeasible.

ADEC, Cominco, and the EPA met to discuss the pending PSD permit, agreeing to install Low NOx on MG–1, MG–3, MG–4, and MG–5, but without agreeing on BACT for MG–17.

After further unsuccessful negotiations, the EPA issued a "Finding of Noncompliance Order" on December 10, 1999, stating that ADEC's authorization of Cominco's construction and installation of new equipment was not in compliance with the Clean Air Act and the Alaska SIP. Pursuant to Sections 113(a)(5) and 167 of the Act, 42 U.S.C. §§ 7413(a)(5) and 7477, the EPA ordered ADEC to withhold issuance of Cominco's PSD permit.

Later that same day, however, in disregard of the EPA's order, ADEC issued the PSD permit along with a second Final Technical Analysis Report.

On February 8, 2000, the EPA sent a letter to ADEC with a formal finding that the December 10, 1999 report and PSD permit failed to comply with federal and state PSD requirements. On the same day, the EPA issued a second order to Cominco preventing the company from beginning construction on the MG–17 generator until Cominco had demonstrated to the EPA's satisfaction compliance with the Act and the SIP.

The EPA's third order, dated March 7, 2000, modified the February 8, 2000 order to allow Cominco to engage in summer-dependent construction activities.

On April 25, 2000, the EPA withdrew its December 10, 1999 order prohibiting ADEC from issuing the permit. In an accompanying letter, however, the EPA emphasized that its findings of noncompli-

ance in the December 10, 1999 and February 8, 2000 orders remained unchanged.

ADEC and Cominco petition this court for review of the December 10, 1999 Finding of Noncompliance and Order; the February 8, 2000 Administrative Order; and the March 7, 2000 Amended Administrative Order. Petitioners claim that the EPA exceeded its authority by issuing enforcement orders invalidating ADEC's issuance of Cominco's PSD permit, and that ADEC acted within its discretion when making its BACT determination.

## II. Procedural History on Appeal and Jurisdiction

The EPA initially challenged our subject matter jurisdiction in a motion to dismiss, which we denied without prejudice, and again in conjunction with the merits of the appeal. In an order dated March 27, 2001, *Alaska v. United States EPA*, 244 F.3d 748 (9th Cir.2001), we determined that we have jurisdiction pursuant to Section 307(b)(1) of the Clean Air Act because the EPA's Administrative Orders to ADEC and Cominco constitute final agency action. 42 U.S.C. § 7607(b)(1) (granting jurisdiction to review final actions of the Administrator). Applying the test in *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), we held that the EPA's actions were final for the purposes of appellate review because the EPA's findings represented its "final position on the factual circumstances," the orders had determined the rights and obligations of the parties, and legal consequences would follow if Cominco chose to disregard the orders and commence construction. *Alaska*, 244 F.3d at 750.

To address Petitioners' contention that the record was incomplete, we also directed the EPA to submit a complete administrative record, withdraw its orders, or file an action in district court. The EPA submitted a declaration that the record was, in fact, complete. On August 3, 2001, we directed Petitioners to respond to the EPA's declaration. In their responses, all the parties effectively agreed that the record as it stood was adequate to resolve the issues on appeal.

On February 28, 2002, in light of the parties' agreement as to the completeness of the record, we requested supplemental briefing on the question of the EPA's authority to issue the orders. Having resolved these preliminary disputes, we now turn to the merits of the appeal.

## III. Authority of the EPA

We agree with the EPA that the plain text, structure, and history of the Act compel the conclusion that the administrative orders fell within the EPA's enforcement and oversight authority.

Under the traditional method of statutory construction, the interpretation of a statute "begin[s] with the plain meaning of its language." *In re Bonner Mall Partnership*, 2 F.3d 899, 908 (9th Cir. 1993). "Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (internal quotation marks omitted).

The EPA's enforcement powers are outlined in Section 113(a)(5), 42 U.S.C. § 7413(a)(5), and Section 167, 42 U.S.C. § 7477, of the Act.

Section 113(a)(5) provides:

Whenever, on the basis of any available information, the Administrator finds that a State is not acting in compliance with any requirement or prohibition of the chapter relating to the construction

of new sources or the modification of existing sources, the Administrator may—

(A) issue an order prohibiting the construction or modification of any major stationary source in any area to which such requirement applies;

(B) issue an administrative penalty order in accordance with [42 U.S.C. § 7413(d)], or

(C) bring a civil action under [42 U.S.C. § 7413(b)].

42 U.S.C. § 7413(a)(5). The referenced "chapter" includes the PSD permit program in "Part C—Prevention of Significant Deterioration of Air Quality." *See* 42 U.S.C. § 7475; H.R.Rep. No. 101–490(I), pt. 10, at 391 (1990) (Section 113(a)(5) "authorizes enforcement actions where a State is not acting in compliance with any requirement of Part C or Part D of Title I.").

Under Section 167, the Administrator "shall ... take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part...." 42 U.S.C. § 7477. "This part" refers to Part C, which establishes the PSD program.

The PSD program is implemented through a permitting system for new and modified "major emitting facilities" in clean air areas. 42 U.S.C. §§ 7475, 7479(1). To receive a permit, the applicant must fulfill the "preconstruction requirement" that a "proposed facility [be] subject to the best available control technology for each pollutant subject to regulation...." 42 U.S.C. § 7475(a)(4). Thus, subjecting a facility to BACT is both a "requirement ... of the chapter relating to the construction of new sources or the modification of existing sources" under Section 113(a)(5), and a "requirement[ ] of this part" under Section 167. *See* S.Rep. No. 95–127, at 12

(1977), *reprinted in* 3 *A Legislative History of the Clean Air Act Amendments of 1977,* at 1386 (Comm. Print 1978) ("[T]here is a national requirement that each new major facility to be located in a clean air area install the best available control technology.").

BACT is defined in Section 169(3) as

an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility....

42 U.S.C. § 7479(3). Here, ADEC, as the "permitting authority," made the initial BACT decision. Because the EPA based its orders on the finding that ADEC had not complied with the BACT requirement, the orders were authorized by the plain language of Section 113(a)(5), as "order[s] prohibiting the construction or modification of any major stationary source in any area to which such requirement applies," and of Section 167, as orders "necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part."

The structure and legislative history of the Act further support the EPA's authority to issue the enforcement orders. Since the original Clean Air Act of 1963, state and local governments have had "primary responsibility" for "the prevention and control of air pollution at its source." *Train v. NRDC,* 421 U.S. 60, 64, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); 42 U.S.C. § 7401(a)(3). Following disappointing state response to air pollution concerns, Congress has consistently increased over time federal authority in pollution control.

In 1970, Congress amended the Act, Pub.L. 91–604, 84 Stat. 1676, "in order to assure that the requirements of the act would be met if the State failed to adopt, implement, or enforce the necessary measures." S.Rep. No. 95–127, at 326 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1405; *see Train,* 421 U.S. at 64, 95 S.Ct. 1470. Fundamentally restructuring the Act "to create an aggressive federally-orchestrated program for air pollution control," the amendments directed the EPA to publish NAAQS and the states to develop implementation plans to meet them. William V. Luneburg, *Clean Air Act Implementation and the Impact of Whitman v. American Trucking Associations, Inc.,* 63 U. Pitt. L.Rev. 1, 5 (2001); 42 U.S.C. § 7410(a)(1).

In 1977, when it became clear that many areas of the country would not attain the NAAQS by the 1970 Amendments' statutory deadline, Congress extended the deadline and amended the Act, dividing the country into nonattainment areas and clean air areas, and establishing the Prevention of Significant Deterioration program to prescribe allowable levels of air quality degradation in clean air areas. Douglas R. Williams, *Cooperative Federalism and the Clean Air Act: A Defense of Minimum Federal Standards,* 20 St. Louis U. Pub.L.Rev. 67, 76 (2001). Congress recognized that the states experienced internal industry "pressure ... to relax their standards with the threat of industrial relocation in other, more permissive States." S.Rep. No. 95–127, at 136–37 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1215. Overarching federal leadership provided "protection for States exercising their right to maintain clean air." *Id.*

The 1990 Amendments strengthened the EPA's enforcement authority in cases where states fail to enforce SIPs or permit requirements. *See* H.R.Rep. No. 101–952, at 348, 358 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3731, 3741. Amendments to Section 113(a)(5) extended enforcement authority to include not only failure to comply with state implementation plan provisions, but also a state's failure to comply with "any requirement or prohibition" of the Act relating to new or modified sources. H.R.Rep. No. 101–490(I), pt. 10, at 391.

Thus, although the state has discretion to make BACT determinations as the permitting authority, the Act provides for EPA enforcement when the state issues a permit based on an improper determination. *See* H.R. Rep. 95–564, at 152 (1977), *reprinted in* 3 *A Legislative History of the Clean Air Act Amendments of 1977,* at 533 (Comm. Print 1978) ("The Administrator shall issue orders and seek other action to prevent the issuance of an improper permit."). Therefore, based upon the plain language and the legislative history of the Act and amendments to it, we hold that the EPA has the ultimate authority to decide whether the state has complied with the BACT requirements of the Act and the state SIP.

ADEC and Cominco contend that the EPA exceeded its authority in issuing the three administrative orders predicated on a finding that ADEC's BACT determination was inadequately justified. They argue that because Section 169(3) gives ADEC, the "permitting authority," discretion to determine BACT, the EPA lacked authority to veto ADEC's judgment based on a mere difference of opinion as to which technology was BACT.

This argument is without merit because neither Section 113(a)(5) nor Section 167 contains any exemption for requirements that involve the state's exercise of discretion. Nothing in the BACT definition of Section 169(3) limits the EPA's authority. It does not follow from the placement of

initial responsibility with the state permitting authority that its decision is thereby insulated from the oversight and enforcement authority assigned to the EPA in other sections of the statute.

Petitioners further contend that the EPA's authority extends only to determining whether ADEC satisfied what they term "objective requirements" listed in the Act and the SIP. However, it is not clear what Petitioners mean by "objective requirements," as opposed to, presumably, discretionary requirements. Instead of defining such requirements, Petitioners offer a non-exhaustive list, including: the requirement of a PSD permit, the inclusion of a BACT determination in the permit, compliance with federally set limits on emissions, and consideration of energy, environmental, economic, and other costs. Whereas failure to comply with any of the foregoing objective requirements would justify the EPA's issuance of enforcement orders under Sections 113(a)(5) and 167, Petitioners argue, the state's BACT determination itself is not subject to EPA approval or veto.

In support of this distinction, Petitioners cite *United States v. Solar Turbines, Inc.*, 732 F.Supp. 535 (M.D.Pa.1989), in which the district court analyzed whether a source's actions constituted a violation of the Act:

> [A] violation is to be assessed against objective standards, namely the source's failure to apply for a permit or receive a permit prior to construction; failure to supply information requested of it by the issuing authority, or failure to comply with specific quantifiable air quality standards or restrictions on emission levels.

*Id.* at 539. However, this case sheds no light on Petitioners' argument because it examined the requirements that a *source* must meet under the Act. Here, the question presented is what requirements the *state* must meet.

In a move that seems to undermine their position, Petitioners also quote a Legal Opinion by the EPA's Office of General Counsel to define what they mean by "objective requirements:"

> [I]n the case of a decision applying best available control technology (BACT) under Section 165(a)(4) for PSD, if a state has met all procedural norms, considered all available control technologies, *and given a reasoned justification of the basis for its decision,* EPA has no grounds on which to challenge a final substantive state decision that does not violate such objective standards.

(emphasis added).

As the emphasized portion demonstrates, this Opinion actually supports the EPA's authority to determine the reasonableness or adequacy of the state's justification for its decision, which is exactly what the EPA did here. The cover letter to the December 10, 1999 Finding of Noncompliance and Order stated the EPA's belief that:

> ADEC's own analysis supports the determination that BACT is selective catalytic reduction (SCR) ... ADEC's decision in the proposed permit therefore is both arbitrary and erroneous.... [T]he State's record reflects that the cost-effectiveness and the collateral issues of energy, environmental, or economic impacts, and other costs, do not justify failure to select SCR as BACT in this case.

Whatever Petitioners mean by "objective requirements," they must concede that the provision of a reasoned justification is one of them. We conclude, therefore, that the EPA had the authority to issue findings and orders on the ground that the State

failed to provide an adequate justification for its BACT decision.

## IV. Validity of the Orders

██ Petitioners alternatively argue that the EPA erred in finding that ADEC was not in compliance because ADEC's BACT determination fulfilled all requirements of the Act. The EPA maintains that ADEC's determination that Low NOx was BACT was "nothing short of incomprehensible, unreasoned, and unsupported."

Under the Act, we may reverse a final action by the EPA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A); *Exxon Mobil Corp. v. United States EPA*, 217 F.3d 1246, 1248 (9th Cir.2000). Upon review of the administrative record, we conclude that the EPA did not act arbitrarily or capriciously in issuing its Findings of Noncompliance and Orders prohibiting construction of the MG–17 generator until ADEC produced a valid PSD permit.

██ A common approach to determining BACT is the "top-down" method, which ADEC purported to apply. Under this method, as detailed in the EPA's *New Source Review Workshop Manual* (1990), the applicant ranks all available control technologies in descending order of control effectiveness. The most stringent technology is BACT unless the applicant can show that it is not technically feasible, or if energy, environmental, or economic impacts justify a conclusion that it is not achievable. *Citizens for Clean Air v. United States EPA*, 959 F.2d 839, 845–46 (9th Cir.1992). If the top choice is eliminated, then the next most stringent alternative is considered, and so on. The most effective control option not eliminated is BACT. *Id.*

Although the top-down approach is not mandated by the Act, if a state purports to follow this method, it should do so in a reasoned and justified manner. ADEC's December 10 Technical Analysis Report rejected SCR because it would have adverse economic ·impacts on the Red Dog Mine. The report states that there are several situations in which a permitting authority can reject a control option for economic considerations: (1) when the applicant, i.e., Cominco, shows that the costs of the control are disproportionately high compared to the cost of control in recent permit decisions; (2) when the cost-effectiveness of the control is outside the range of costs being borne by similar sources in recent BACT determinations; and (3) when the applicant shows the cost of the control option will cause adverse economic impact to the facility.

ADEC's report demonstrates, however, that none of these situations were present. As to the first situation, the report reveals that there were no recent permit decisions involving BACT determinations for diesel engines used as primary power generators.

As to the second, the cost-effectiveness of recent NOx control BACT decisions ranged from $0 to $7,000 per ton of NOx removed. According to ADEC's estimate, the cost-effectiveness of SCR was $2,100 per ton of NOx removed, a cost well within the applicable range.

Finally, ADEC attempted to determine whether the costs of SCR would be excessive by analogizing the costs of the MG–17 generator to the costs of other electric utilities. ADEC began with the assumption that SCR for MG–17 would cost 3 cents per kilowatt-hour. It reasoned that if Cominco "did not have a powerhouse, it would probably buy power from a rural Alaska utility. From a cursory review, it appears that the average cost of electricity in rural-Alaska is approximately 15¢ per kilowatt hour." Because a 3¢ increase

would "be equivalent to a 20% increase in the electric rate of the facility," ADEC concluded that "this is a disproportionate cost increase when viewed as an electric utility."

This rationale is unfounded, however, because Cominco does not, in fact, buy power from an electric utility. Therefore, the use of the 15¢ figure is not justified. ADEC itself acknowledges the flimsiness of its own hypothetical in the report:

> Another perhaps better way to determine if the cost of BACT is excessive, is for the applicant to present detailed financial information showing its effect on the operation. However, the applicant did not present this information. Therefore, no judgment can be made as to the impact of a $2.1 million control cost on the operation, profitability, and competitiveness of the Red Dog Mine.

ADEC's report demonstrates that Cominco failed to show that any of the situations in which a control option can be rejected for cost considerations was applicable. Rather than concluding, logically, that Cominco had failed to show that SCR could be eliminated, ADEC instead invented its own reason for the economic infeasibility of SCR. ADEC described the Mine's "dramatic" reversal of unemployment rates in its borough:

> Before the Mine opened in 1990, borough wages were well below state average wages.... The Mine now provides high paying year round employment. ... Cominco's contractors, vendors, and wages have boosted the borough's private sector economy.

> ... With government support and endorsement of Cominco's operations, including the Production Rate Increase Project, the Red Dog Mine will continue to influence and benefit the residents and economy of this region.

ADEC concluded that it had chosen, as the "foremost consideration to judge economic impacts of SCR," the "direct cost of SCR technology and its relationship to retaining the Mine's world competitiveness as it relates to community socioeconomic impacts." To "support Cominco's[PRI Project] ... and its contributions to the region," ADEC rejected SCR "based on excessive economic cost—$2.9 million capital cost, with annualized costs approaching $635,000." The report fails to explain how the costs of SCR would affect the Mine's world competitiveness or why the capital cost is excessive.

ADEC's apparent motivation for the elimination of SCR—appreciation for Cominco's contribution to the local economy—is not an accepted justification in the top-down approach. Worse still, it is uncomfortably reminiscent of one of the very reasons Congress granted EPA enforcement authority—to protect states from industry pressure to issue ill-advised permits. *See* S.Rep. No. 95–127, at 136.

Because ADEC's report shows that (1) Cominco failed to meet its burden of demonstrating that SCR was economically infeasible; and (2) ADEC failed to provide a reasoned justification for its elimination of SCR as a control option, the EPA did not act arbitrarily and capriciously in concluding that ADEC abused its discretion by making an internally inconsistent and unreasonable BACT determination. The petition for review is therefore

**DENIED.**