**NATIONAL PARKS CONSERVATION ASSOCIATION, INC., Plaintiff,**

v.

**TENNESSEE VALLEY AUTHORITY, Defendant.**

**No. 3:00–CV–547.**

United States District Court,
E.D. Tennessee,
at Knoxville.

Nov. 26, 2001.

Wade V. Davies, Ritchie, Fels & Dillard, P.C., Knoxville, TN, Debra C. Poplin, Knoxville, TN, Reed Zars, Laramie, WY, George E. Hays, San Francisco, CA, William J. Moore, III, Henrichsen, Siegel and Moore, Jacksonville, FL, for plaintiff.

Ronald E. Klipsch, Robert C. Glinski, Harriet A. Cooper, Knoxville, TN, for defendant.

## MEMORANDUM OPINION

JARVIS, District Judge.

This is an action under the federal Clean Air Act (CAA), 42 U.S.C. §§ 7401 through 7671(q), for injunctive and declaratory relief, as well as for the imposition of civil penalties. Plaintiff, the National Parks Conservation Association, Inc. (NPCA), is a non-profit citizens organization dedicated to preserving, protecting and enhancing the U.S. National Park System. It contends that over an approximately five-year period, defendant Tennessee Valley Authority (TVA) has emitted excessive pollutants from its Kingston and John Sevier coal-fired power plants, in violation of the CAA. The parties have filed multiple motions for summary judgment. Few of the historical facts are in dispute. Because this court concludes that plaintiff failed to comply with the notice provisions of the CAA, subject matter jurisdiction is lacking. Alternatively, even if plaintiff had satisfied those notice requirements, TVA is entitled to summary judgment because this lawsuit is, in essence, a collateral attack upon the State Implementation Program (SIP) of the Tennessee Department of Environment and Conservation (TDEC), which cannot properly be the basis of a citizen suit under the CAA.

## I.

### Factual Background

TVA operates a number of fossil fuel-fired electricity generating plants in areas throughout the Tennessee Valley. One of these plants is the Kingston Power Plant, located in Kingston, Tennessee. The Kingston Power Plant generates electricity by burning coal and has nine "units" that generate electricity. Construction of the Kingston units began in 1951 and was completed in 1955. The Kingston Plant burns approximately 3.8 million tons of coal, 573,800 gallons of fuel oil, 336,000 tons of wood waste, and 34,000 gallons of used oil and solvents per year. Airborne coal combustion by-products from Kingston units one through five are emitted through a common, 1,000–foot smokestack, and combustion by-products from units six through nine are emitted through a second 1,000–foot smokestack. According to TVA's 1999 toxic release report, the Kingston Power Plant emits on an annual basis over seven million pounds of hazardous air pollutants, including 2,109 pounds of arsenic compounds, 6,107,161 pounds of hydrochloric acid, 597,381 pounds of hydrogen fluoride, and 1,078,380 pounds of sulfuric acid. The Kingston Plant employs no pollution control technology to reduce its emission of sulfur dioxide or hazardous air pollutants into the atmosphere.

The John Sevier Power Plant, located in Rogersville, also burns coal. The John Sevier Plant consists of four generating units which were constructed between 1955 and 1957. Airborne coal combustion

by-products from John Sevier units one and two are emitted through a common, 350–foot smokestack. Combustion by-products from units three and four are emitted through a second, 350–foot smokestack. According to TVA's 1997 Title V operating permit application, John Sevier emits an annual 335 tons of particulate matter, over 12,000 tons of nitrogen oxides, approximately 52,000 tons of sulfur dioxide, and approximately 5 million tons of $CO_2$.

Elevated levels of fine particulate matter in the atmosphere, similar to the particulate matter emitted by the Kingston and John Sevier Power Plants, contributes to a visual plume and haze. Fine particulate matter is transported by wind for many miles. If breathed, fine particulate matter may be lodged deep in the lungs and has been linked with increased human illness and mortality.

According to the NPCA, the applicable emission standard for opacity is 20%, and it contends that combined, the two plants have exceeded that standard more than 6,500 times during the five-year period between 1996 and 2000. Although it is not completely clear, it appears that NPCA contends that every time TVA exceeded the 20% standard and reported that emission during that five-year period, it has been guilty of a violation of the CAA.

To understand the issues in this case, it is necessary to consider the relationship between the federal and state agencies who concern themselves with air pollution under the CAA.

The Clean Air Act enacts a cooperative scheme of federal and state responsibility for achieving national air quality standards. The Environmental Protection Agency (EPA) is directed to identify air pollutants and to promulgate national ambient air quality standards specifying acceptable levels of those pollutants. 42 U.S.C. §§ 7409–10 (1994). The EPA has adopted such standards. Each state is required to adopt and submit to EPA a State Implementation Program (SIP) specifying the methods that that state will use to attain the air quality standards set by EPA. EPA reviews the SIP to determine whether it meets specified criteria and, if it does, EPA must approve of it. 42 U.S.C. § 7410. The State may devise the particular components of its own plan so long as the plan is adequate to meet the standards promulgated by EPA. The State may also propose revisions to its plan and submit them to EPA for approval. Under Tennessee law, the Tennessee Department of Environment and Conservation (TDEC) and its Air Pollution Control Board administer the provisions of Tennessee's air pollution implementation plan. T.C.A. §§ 68–201–101 through 69–201–203.

■ The CAA does not require states to adopt an operating permit program, under which air pollution sources receive permits to operate their facilities. However, where a state voluntarily adopts such a program and submits it to EPA for approval as a part of its SIP, EPA considers such operating permit programs to be part of the approved SIP. *See* Fed.Reg. 27, 274; 27, 282 (June 28, 1989).

EPA has approved an SIP for Tennessee and has also approved revisions from time to time. In its current form, the Tennessee SIP sets forth standards for visible emissions (opacity), including the method for monitoring opacity levels. The Tennessee SIP also contains an operating permit program. In particular, with respect to opacity, Tennessee's SIP provides for a general standard of opacity of 20%, but authorize opacity levels to exceed 20% once per hour for any reason. TDEC Rule 1200–3–5–.01(1). In addition, opacity levels may exceed 20% during "routine start up and shut down conditions" (1200–3–5–.02(1); 1200–3–20–.07(1)) and during

periods of equipment malfunctions (Chapter 1200–3–20).

The Tennessee regulations also require visible emissions levels to be monitored "by a certified evaluator" (1200–3–5–.03(1–3)). This is done for utility sources under what is known as EPA Method Nine. This is a visual monitoring method by which a trained individual periodically observes a smoke plume from outside the plant to determine the opacity of the plume. Method Nine observations are performed in daylight, when the sun is at a certain angle, and the plume is at a certain angle in relation to the stack. The EPA regulations leave it to the states to determine how often Method Nine testing should be done. Tennessee's SIP does not require visible emissions testing to be done even once a year.

The Tennessee SIP also provides for alternate opacity standards. In particular, the SIP, which has been approved by the EPA, authorizes Tennessee and the regulated party to agree to establish "an emission limit more restrictive than that otherwise specified in this Chapter" (1200–3–5–.01(3)), and to agree to the use of continuous opacity monitoring (COM) (1200–3–5–.01(5)). This equipment is a calibrated light source that provides for accurate and precise measurement of opacity at all times. The SIP requires that, where the more restrictive standard is used, it shall be included as part of the source's operating permit (1200–3–5–.01(3)), and further provides that such operating permits are incorporated as part of the SIP.

TVA agreed to use at its John Sevier and Kingston Plants COMs, or continuous opacity monitoring, to demonstrate compliance. The permits for the John Sevier and Kingston Plants also authorize opacity emission at these plants to exceed 20% for 2% of the time during each calendar quarter, excluding periods of permitted start-up or shut-down and excused malfunctions.

The plaintiff contends that the above exceptions for certain emissions have not been approved by the EPA and are therefore invalid. TDEC has not sought approval of the EPA for these exceptions based on the belief that use of the COMs to continuously monitor the emissions from the two plants is an emission limit more restrictive than that otherwise specified in the SIP (*i.e.*, Method Nine). Under the language of the SIP, EPA approval for this more restrictive standard was not necessary. TDEC explained this conclusion as follows:

[TDEC] considers the two-percent de minimis provision to which the TVA plants at issue are subject ... to be an inherent and substantive part of determining compliance with the 20–percent opacity standard established by TDEC Rule 1200–3–5–.01 when COMs are used to determine compliance under TDEC Rule 1200–3–5–.03(5). *See also* TDEC Rule 1200–3–5–.01(3). The substantive effect of the 20% opacity standard depends in part on the method used to determine compliance. In recognition of the fact that the use of opacity monitors converts a "periodic" determination of compliance to a "continuous" one, and in recognition of the increased stringency of the COMs-enforced standard, [TDEC] applies a two-percent de minimis level to the 20–percent opacity standard as verified through the use of certified readers when opacity monitors are used to determine compliance. TVA's operating permits for the Kingston and John Sevier Fossil Plants demonstrate this practice by establishing the COM-enforced opacity standard through the requirement to use opacity monitors for determining compliance with the opacity standard. These permits also specify that periods of excess emissions, not otherwise excused, will not be considered automatic violations of the 20–per-

cent visible emission standard as long as the total amount of time [of such emissions] is not in excess of two percent of the total time in a calendar quarter. To summarize, TDEC's regulations and TVA's operating permits for the John Sevier and Kingston plants authorize opacity levels to exceed 20% when they are excused in a number of factual circumstances, and further authorize unexcused levels to exceed 20% up to 2% of the time in each calendar quarter. During the five-year period in question, TVA has submitted to TDEC a quarterly report setting out each time, measured at six-minute intervals, that the 20% opacity standard has been exceeded, as detected by its continuous monitoring system, and explaining the reason for each excess emission or that such emission is unexcused.

On July 10, 2000, NPCA sent two letters to TVA notifying TVA of its intent to sue, one pertaining to the Kingston Plant and the other to the John Sevier Plant. The letters were identical in relevant part and stated:

> The suit will allege that TVA, in its operation of the [Kingston or John Sevier] facility, has regularly violated for at least the last five years, and continues at the present time to violate: (1) the 20% opacity limit in the Tennessee State Implementation Plan [SIP], 40 CFR § 52.2220, et seq.; TAPCR 1200-3-5-.01(1) and (2) the 20% opacity limit set forth in the federally applicable provisions of Condition O6 in [the facility's] Operating Permit....

The letters further stated that "[t]he violations of the opacity limitations described above are demonstrated by data from continuous opacity monitors at the ... facility."

NPCA served its first amended complaint on November 20, 2000, alleging that TVA violated the 20% standard and the Tennessee SIP "without lawful excuse," but did not allege that TVA had violated the terms of its permits. The amended complaint did not identify the specific opacity exceedances that were the subject of the suit other than to purport to count the total number of opacity exceedances between January 1, 1996, and June 30, 2000, alleging that there were 6,592 such events. NPCA later filed motions for partial summary judgment claiming that the 2% provision of Condition 6 of the permits was not authorized by the Tennessee SIP and that the SIP did not provide for excusing periods of equipment malfunctions from opacity standards. In its motions, it is clear that NPCA is in effect challenging two categories of purported exceedances: those allowed by the SIP under the 2% provision of Condition 6 of the permits, and those excused by the State as malfunctions or otherwise. In essence, NPCA contends that TDEC could not lawfully issue the permits and their exceptions to the Kingston and John Sevier Plants without obtaining EPA approval. TDEC issued the permits without first seeking EPA approval because of the belief that since TVA agreed to continuously monitor the emissions from the plants, the SIPs had in fact become more restrictive and, under the terms of the relevant regulations, EPA approval was not necessary.

## II.

### The Question of the Court's Subject Matter Jurisdiction

 Citizen suits under the Clean Air Act are a jurisdictional prerequisite to suit and must be strictly complied with. *See Walls v. Waste Resource Corporation*, 761 F.2d 311, 316–17 (6th Cir.1985). The Sixth Circuit Court of Appeals noted in a water pollution case under the Clean Water Act, which has a similar notice provision, that Congress required prior notice because citizen suits were intended to supplement,

rather than to substitute for, governmental enforcement. The Sixth Circuit noted:

> [F]ar from being a mere formality, prior notice was viewed by Congress as crucial in defining the proper role of the citizen suit. The citizen suit notice provisions were intended to give the EPA an opportunity to resolve issues regarding the interpretation of complex environmental standards by negotiation, unhindered by the threat of an impending private lawsuit. . . . Congress evidently believed . . . that the private lawsuit should be a supplemental enforcement tool, rather than a substitute for agency involvement.

*Walls v. Waste Resource Corporation,* 761 F.2d 311, 317 (6th Cir.1985). Notice under the citizen suit provision of the CAA, 42 U.S.C. § 7604(b) provides that no action may be commenced prior to 60 days after the plaintiff has given notice of the violation "to any alleged violator of the standard, limitation, or order . . ." allegedly violated. Notice under this subsection must be given in the manner that the administrator of the EPA prescribes by regulation. The pertinent EPA regulation regarding the content of the required notices provides as follows:

> Notices to the Administrator, States, and alleged violators regarding violation of an emission standard or limitation . . . shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice.

40 CFR § 54.3(b) (2000). Strict compliance with the statutory notice requirements is a mandatory jurisdictional prerequisite to maintaining suit under the CAA and similar environmental laws. *Greene v. Reilly,* 956 F.2d 593, 594 (6th Cir.1992). It is the plaintiff's burden to establish the existence of subject matter jurisdiction. *Steel Company v. Citizens for a Better Environment,* 523 U.S. 83, 103–04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

■ Upon a careful review of the notice provided by the NPCA to TVA, it is clear that plaintiff has not complied with the mandatory notice requirements under the CAA. While plaintiff's letters do indicate their belief that defendant has violated the 20% opacity limit in the Tennessee SIP, it does not specify the dates of the alleged violations or identify at which sites the violations occurred. Rather, the notice only states that TVA has "regularly violated" the standard "for at least the last five years. . . ." Plaintiff has simply not provided the specificity in its notice which would be required for TVA to determine when its alleged unlawful exceedances had occurred.

More importantly, however, it is clear from NPCA's complaint and first amended complaint that its lawsuit is not premised upon TVA violating a "standard, limitation, or order" of the EPA or the TDEC. Rather, the essence of the plaintiff's lawsuit is that the state agency, TDEC, acted unlawfully in modifying TVA's permits for the Kingston and John Sevier plants without first seeking EPA approval. Plaintiff is not claiming that defendant has in any way violated TDEC regulations or the permits which it entered into with TDEC. Thus, the notice given by the plaintiff states one thing, that defendants violated the Tennessee SIP 20% opacity limit, and the lawsuit filed by plaintiff states another, that the Tennessee SIP, as applied to TVA by the TDEC, is unlawful. Thus, I cannot conclude that plaintiff has sufficiently complied with the strict notice requirements of

the CAA, and therefore this court lacks subject matter jurisdiction over this action.

## III.

### *The Appropriateness of this Action Under the Clean Air Act*

■ Even if plaintiff had complied with the requirements of the CAA, I am of the opinion that its claim is not actionable under that Act. During the relevant five-year period, TVA, in its quarterly reports to the TDEC, reported each of its exceedances of the 20% standard and coded each exceedance under one of the permit exceptions. In its first amended complaint, plaintiff alleges that TVA regularly exceeded the 20% opacity limit set forth in the Tennessee SIP. Based on information obtained from TVA's quarterly reports to the TDEC, plaintiff contends that the Kingston Plant impermissibly exceeded the 20% limitation at least 3,861 times, and the John Sevier Plant exceeded the 20% limitation at least 2,731 times. However, it is undisputed that every exceedance of the 20% standard does not violate the Tennessee SIP. In fact, without looking to the permit, the Tennessee SIP, which has been approved by the EPA, allows at least one six-minute period of exceedance each hour. There is no evidence that plaintiff's calculation of the number of exceedances gives TVA credit for these indisputably legal exceedances. Further, as indicated above, the facially valid permits of the Kingston and John Sevier Plants allow more exceedances for "de minimis" exceedances for up to 2% of the time each calendar year with no explanation necessary for the exceedance and other excused periods for permitted start-up and shut-down and certain excused malfunctions. It is undisputed that TDEC, under the permits issued to TVA for the two plants, has approved of each of the exceedances during the five-year period reported by TVA for the two plants. Plaintiff has not identified a single exceedance that has not been approved by TDEC under TVA's facially valid permits. Under the circumstances, it is clear that plaintiff is not alleging that TVA violated any of the terms of the TDEC permits, but rather is attacking the legality of the permits issued by the Tennessee state enforcement agency. As such, plaintiff's lawsuit is in effect a collateral attack on a facially valid permit issued by the state enforcement agency.

An analogous situation arose in *United States v. Solar Turbines, Inc.,* 732 F.Supp. 535 (M.D.Pa.1989), wherein that court held that the EPA may not pursue an enforcement action against an owner/operator who has committed no violation other than acting in accordance with a facially valid permit:

> It is apparent that Solar is caught in the midst of a conflict between PADER and EPA. Before enforcement action may be brought against Solar, it is imperative that these two agencies resolve their differences concerning the proper method of conducting and supporting a BACT analysis. [Citation omitted]. Accepting EPA's position would not only be contrary to the general enforcement scheme in the Clean Air Act, but would also lay waste to a source's ability to rely on a permit it had been issued by an authorized state permitting agency.

*Solar* at 540. Similarly, in *U.S. v. AM General Corporation,* 34 F.3d 472 (7th Cir. 1994), the Seventh Circuit Court of Appeals also disallowed a collateral attack on a facially valid state permit. The Seventh Circuit noted the following:

> ... We cannot find in the text of the Clean Air Act, or elsewhere, any indication that Congress expressly or by implication meant to authorize the EPA to mount a collateral attack on a permit by bringing a civil penalty action as many as five years after the permit had been

granted and the modification implemented, 28 U.S.C. § 2462, by which time a defendant would have accrued a potential liability in excess of $40 million, even though it had been operating under a permit valid on its face and never before challenged. That would be a harsh remedy and we cannot be confident in the absence of any clues that it was one intended to be useable in the circumstances of this case.

*Id.* at 475. Similarly, I find no evidence in the language of the Clean Air Act to indicate that Congress intended that citizen suits could be used to collaterally attack facially valid state permits. 42 U.S.C. § 7604(a) provides the provision under which citizen suits may be brought. Relevant to this lawsuit, subsection (a)(1) allows a citizen suit against a person in violation of "an emission standard or limitation under this chapter" or "an order issued by the Administrator or a State with respect to such a standard or limitation." Thus, although a citizen suit may be brought against a polluter violating a standard or limitation set by the EPA or by a state, there is no citizen suit provision allowing a citizen plaintiff to challenge an emission standard or limitation, and that is what plaintiff here seeks to do. Quite simply, plaintiff's dispute is with the State of Tennessee through TDEC for issuing these permits.

Finally, NPCA claims that TDEC's interpretation that COM monitoring, with its 2% de minimis exception, is a more restrictive emission standard is unreasonable and, perhaps, therefore not facially valid. I disagree. I agree with the D.C. Circuit Court of Appeals that changing the method of measuring compliance with an emission limitation can affect the stringency of the limitation itself. *See Appalachian Power Company v. EPA,* 208 F.3d 1015, 1027 (D.C.Cir.2000); *Portland Cement Association v. Ruckelshaus,* 486 F.2d 375, 396–97 (D.C.Cir.1973). Obvious-ly, monitoring the smokestack emissions continuously with equipment capable of reliably measuring the opacity will identify many more exceedances than will be identified by an operator "eyeballing" the smokestack emissions once a day, or less. I believe that it was completely reasonable for TDEC to consider the COM monitoring by TVA at its plants to be a more restrictive standard than the Tennessee SIP required and therefore concluding that EPA approval of that more restrictive standard was not necessary.

## IV.

### *Conclusion*

To summarize, I conclude that the plaintiff has not complied with the notice requirements of the Clean Air Act, and this court therefore lacks subject matter jurisdiction. Further, even if plaintiff had met the notice requirements, the Clean Air Act provides no cause of action for a citizen suit collaterally attacking a permit issued by the State's enforcement agency. Accordingly, plaintiff's motion for additional time to serve reply [Court File # 30] will be granted; TVA's motion to dismiss or, in the alternative, for summary judgment for lack of subject matter jurisdiction [Court File # 32] will be granted; plaintiff's motion to withdraw plaintiff's Rule 26(f) report [Court File # 35] will be granted; NPCA's motion for partial summary judgment to strike TVA's sovereign immunity defense [Court File # 36] will be denied as moot; TVA's motion to strike portions of affidavits and declarations submitted by plaintiff on issue of standing [Court File # 50] will be denied as moot; NPCA's unopposed motion for extension of time [Court File # 53] will be granted; defendant TVA's motion for continuance of trial [Court File # 54] will be granted; NPCA's motion to exclude testimony from TVA's experts [Court File # 58] will be denied as

moot; TVA's unopposed motion for extension of time [Court File # 62] will be granted; NPCA's motion for partial summary judgment regarding central legal issues in case [Court File # 15] will be denied; NPCA's motion for partial summary judgment on the issue of standing [Court File # 18] will be denied; NPCA's motion for partial summary judgment regarding TVA's liability for opacity violations [Court File # 25] will be denied; and this action will be dismissed.

Order accordingly.

### ORDER

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED as follows: (1) plaintiff's motion for additional time to serve reply [Court File # 30] is GRANTED; (2) TVA's motion to dismiss or, in the alternative, for summary judgment for lack of subject matter jurisdiction [Court File # 32] is GRANTED; (3) plaintiff's motion to withdraw plaintiff's Rule 26(f) report [Court File # 35] is GRANTED; (4) NPCA's motion for partial summary judgment to strike TVA's sovereign immunity defense [Court File # 36] is DENIED AS MOOT; (5) TVA's motion to strike portions for affidavits and declarations submitted by plaintiff on issue of standing [Court File # 50] is DENIED AS MOOT; (6) NPCA's unopposed motion for extension of time [Court File # 53] is GRANTED; (7) defendant TVA's motion for continuance of trial [Court File # 54] is GRANTED; (8) NPCA's motion to exclude testimony from TVA's experts [Court File # 58] is DENIED AS MOOT; (9) TVA's unopposed motion for extension of time [Court File # 62] is GRANTED; (10) NPCA's motion for partial summary judgment regarding central legal issues in case [Court File # 15] is DENIED; (11) NPCA's motion for partial summary judgment on the issue of standing [Court File # 18] is DENIED; (12) NPCA's motion

for partial summary judgment regarding TVA's liability for opacity violations [Court File # 25] is DENIED; and this action is DISMISSED.