[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 30, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-11314

_____

D. C. Docket No. 02-00151-CV-JTC-3

SIERRA CLUB,
PHYSICIANS FOR SOCIAL RESPONSIBILITY,
GEORGIA FORESTWATCH,
EILEEN LANGE,

Plaintiffs-Appellees,

versus

GEORGIA POWER COMPANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 30, 2006)**

Before BLACK, HULL and FARRIS[*], Circuit Judges.

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

HULL, Circuit Judge:

In this citizen enforcement action, the Sierra Club and other public interest plaintiffs (collectively, "Sierra Club") allege violations of the Clean Air Act, 42 U.S.C. §§ 7401-7671q, at Plant Wansley, a large power plant owned and operated by Georgia Power Company ("Georgia Power"). Specifically, Sierra Club asserts that on thousands of occasions between 1998 and 2002, Plant Wansley's emissions exceeded limits prescribed by the Plant's operating permit issued under Title V of the Clean Air Act (the "Title V permit").

The district court granted partial summary judgment in favor of Sierra Club on Counts One and Two of the complaint. After review and oral argument, we reverse the district court's finding of liability as a matter of law on those counts and remand for further proceedings regarding liability.

## I. The Clean Air Act

Untangling this dispute requires an understanding of both the state and the federal responsibilities under the Clean Air Act. As such, we begin with an overview of the Clean Air Act's scheme of joint state and federal implementation.

## A. State Implementation Plans ("SIPs")

The Clean Air Act strives "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive

2

capacity of its population." 42 U.S.C. § 7401(b)(1). The Clean Air Act sets out a two-stage process for achieving this goal. In the first stage, the federal Environmental Protection Agency ("EPA") sets "national ambient air quality standards" for various pollutants. 42 U.S.C. § 7409. In the second stage, each state creates and implements a plan, known as a "State Implementation Plan" or "SIP," to ensure its air meets the EPA standards. See 42 U.S.C. § 7410.

Before implementing its plan, each state must submit a proposed SIP to the EPA for approval. 42 U.S.C. § 7410(a)(1). To gain EPA approval, the SIP must "include enforceable emission limitations and other control measures, means, or techniques . . . as may be necessary or appropriate to meet the applicable [Clean Air Act] requirements." 42 U.S.C. § 7410(a)(2). Each state's SIP must "assure that national ambient air quality standards are achieved." 42 U.S.C. § 7410(a)(2)(c).

Each state must revise its SIP periodically to account for new EPA standards and new emissions reduction technologies. 42 U.S.C. § 7410(a)(2)(H). Like an entirely new SIP, any SIP revisions must be open to public hearing and comment and must be approved by the EPA. 42 U.S.C. § 7410(a)(1). The EPA may also make what is known as a "SIP call," notifying a state of inadequacies in its current SIP and requesting that the state submit a revised plan. See 42 U.S.C. §

3

7410(k)(5).

Georgia's SIP provisions are codified in the Georgia Rules for Air Quality Control, see Ga. Comp. R. & Regs. Ch. 391-3-1, which for simplicity we refer to as the Georgia Rules.

## B.   The Title V Permit

In 1990, Congress amended the Clean Air Act to add Title V, see 42 U.S.C. §§ 7661-7661f, to assist in compliance and enforcement of air pollution controls. Clean Air Act Amendments of 1990, Pub. L. No. 101-549, §§ 501-507, 104 Stat. 2399, 2635-48 (1990).  "Under Title V, major stationary sources of air pollution are required to obtain an operating permit, which establishes the [Clean Air Act] requirements for, among other things, emission limitations relevant to the particular polluting source."  Legal Envtl. Assistance Found., Inc. v. EPA, 400 F.3d 1278, 1279 (11th Cir. 2005).

The intent of Title V is to consolidate into a single document (the operating permit) all of the clean air requirements applicable to a particular source of air pollution.  The Title V permit program generally does not impose new substantive air quality control requirements.  Rather, a Title V permit "enable[s] the source, States, EPA, and the public to understand better the requirements to which the source is subject, and whether the source is meeting those requirements."

Operating Permit Program, 57 Fed. Reg. 32,250, 32,251 (July 21, 1992) (codified at 40 C.F.R. § 70).

Title V authorizes each state to design its own stationary source permitting program and to submit that program to the EPA for approval. 42 U.S.C. § 7661a. Georgia's Title V permitting program began on an interim basis in 1995. In 2000, the EPA granted final approval of Georgia's Title V program effective August 7, 2000. See 40 C.F.R. § 70 app. A.[1] As with Georgia's other duties under the Clean Air Act, the Georgia Title V program is administered by the Environmental Protection Division ("EPD") of Georgia's Department of Natural Resources.

When the state EPD issues a Title V permit, the terms of the permit must comply with Georgia's EPA-approved SIP. See 40 C.F.R. § 70 (setting minimum requirements for state operating permit programs and standards for state-issued permits).[2] While the state EPD is primarily responsible for issuing Title V permits in Georgia, each permit approved by the EPD also must be submitted to the federal EPA for review. See 42 U.S.C. § 7661d(b); see generally N.Y. Pub. Interest

---

[1]The EPA approved Georgia's Title V program on an interim basis in November 1995. See Clean Air Act Final Interim Approval of Operating Permits Program; Georgia, 60 Fed. Reg. 57,836 (Nov. 22, 1995). Subsequently, Georgia submitted to the EPA a series of revisions to the program before the EPA issued its final approval in 2000. See 40 C.F.R. § 70 app. A.

[2]In addition, the state EPD may not approve a permit application without adhering to certain public notice and comment procedures. See 40 C.F.R. § 70.7(a)(1)(ii); 40 C.F.R. § 70.7(h).

Research Group, Inc. v. Johnson, 427 F.3d 172, 176 (2d Cir. 2005). The EPA may object to the permit and send it back to the state EPD to correct the problem perceived by the EPA. Id. at 176. If the EPA declines to object to the submitted permit within 45 days, "any person" may petition the EPA requesting that the agency object. Id.[3]

## C.    Citizen Enforcement

The Clean Air Act gives "any person" the authority to bring a civil action on his or her own behalf "against any person . . . who is alleged to have violated . . . an emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1). "An emission standard or limitation" is defined to include "any other standard, limitation, or schedule established under any permit issued pursuant to [Title V] or under any applicable State implementation plan approved by the [EPA] Administrator." 42 U.S.C. § 7604(f)(4). Accordingly, citizens may sue to enforce the terms of a stationary source's Title V permit.

"'[T]he citizen suit is meant to supplement rather than to supplant governmental action.'" Am. Canoe Ass'n, Inc. v. City of Attalla, 363 F.3d 1085,

---

[3]The Clean Air Act requires that the EPA "shall . . . object" to the permit if the petition demonstrates that the permit does not comply with the Clean Air Act. Johnson, 427 F.3d at 176. The EPA's denial of a petition to object to a Title V permit is subject to judicial review. Id.; see also 42 U.S.C. § 7607(b) (granting jurisdiction to the D.C. Court of Appeals to review a variety of EPA decisions taken under the Clean Air Act).

1089 n.5 (11th Cir. 2004) (quoting <u>Gwaltney of Smithfield, Ltd. v. Chesapeake</u> <u>Bay Found., Inc.</u>, 484 U.S. 49, 60, 108 S.Ct. 376, 383 (1987)). As such, prior to initiating litigation, a citizen enforcer must notify the EPA, the alleged violator, and the relevant state agency of the citizen's intent to sue. 42 U.S.C. § 7604(b). The citizen enforcer may not sue until sixty days after sending the notice letters, and his lawsuit is barred if "the [EPA]Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order." 42 U.S.C. § 7604(b)(1)(B).

## II. Plant Wansley

Plant Wansley, located in Heard County, Georgia, is a large power plant facility that burns fossil fuels in seven principal emission units. Two of these units are older, coal-fired, steam electric generating units that emit exhaust through a 1000-foot tall stack. These older units are referred to as SG01 and SG02.

Plant Wansley's Title V permit limits the opacity of emissions from SG01 and SG02 to 40%. [Permit Condition 3.4.2].[4] This permit condition is a

---

[4]"Opacity" refers to the visibility of the emissions exiting the stack. A 100% opacity would mean that no light at all could pass through the emissions, whereas 0% opacity would mean light passes completely through the emissions and they are effectively invisible. While opacity is not itself a regulated pollutant, it acts as a measurement surrogate for particulate matter (PM), which is a regulated pollutant for which the EPA has set national ambient air quality standards.

restatement of the identical requirement from the Georgia SIP, a requirement that appears in the Georgia Rules. See Ga. Comp. R. & Regs. 391-3-1-.02(2)(b)(1). The 40% opacity limit has been part of Georgia's SIP for the entire period relevant to this lawsuit.

Plant Wansley's permit requires that the Plant continuously monitor the opacity of its emissions and report all excess emissions to the EPD. [Permit Conditions 5.2.1.a, 5.2.7.a, 5.3.1].[5] Plant Wansley has installed what is known as a continuous opacity monitoring system, or "COMS," on the two coal-fired units. The COMS, which is located at a height of 430 feet within the stack, shines a light through the emissions to measure opacity. The COMS summarizes the opacity data over six-minute intervals, so there is a different opacity measurement for every six-minute period. Once Plant Wansey submits this data to the EPD and EPA, these emissions reports become public documents.

Plant Wansley's COMS data shows that during roughly 4,000 six-minute intervals from 1998 to 2002, the opacity of emissions eminating from SG01 or SG02 exceeded 40%. Based on this data, Counts One and Two of Sierra Club's lawsuit allege that the emissions from SG01 and SG02 represent violations of the Georgia SIP and the terms of Plant Wansley's Title V permit.

---

[5]See note 10, infra.

In the district court, Georgia Power did not dispute the COMS data and thus the fact that these exceedances occurred is not at issue. Instead, Georgia Power contends that these exceedances were not Clean Air Act violations because all exceedances occurred during periods of startup, shutdown, or malfunction ("SSM"). The permit and the Georgia Rules each include an SSM provision that, according to Georgia Power, allows Plant Wansley to exceed the 40% opacity limit during SSM. Thus, we turn to the state-wide SSM Rule and the Plant Wansley-specific SSM condition in Plant Wansley's Title V permit.

## A. The Georgia SSM Rule

Georgia's SSM Rule was adopted as part of the Georgia SIP in 1979 and approved by the EPA in 1980.[6] Since 1980, the Georgia SSM Rule has not been revised and has been a continuous part of the Georgia SIP.

The Georgia SSM Rule expressly addresses exceedances that occur during SSM. According to the Georgia SSM Rule, "[e]xcess emissions resulting from

---

[6]There has been some confusion over the original date of approval of the Georgia SSM Rule. Although the exact language of the SSM Rule is not quoted, Federal Register entries from 1979 and 1980 suggest that the Georgia SSM Rule was approved in 1980. See 44 Fed. Reg. 47,557, 47,558 (Aug. 14, 1979) (discussing the Georgia SIP and stating that "[a] new subsection has been added concerning the conditions under which excess emissions resulting from [SSM] may be excused"); 45 Fed. Reg. 780 (Jan. 3, 1980) (EPA approval of the Georgia SIP discussed in 44 Fed. Reg. 47,557); 40 C.F.R. § 52.572 (1980) (approving Georgia SIP). It also appears that the EPA itself believes the SSM Rule was approved in 1980. See In re: Monroe Power Co., Pet. No. IV-2001-8, at 13 (EPA Oct. 9, 2002).

In any case, on appeal both parties apparently accept that the SSM Rule has been part of Georgia's SIP since 1980.

9

startup, shutdown, [or] malfunction of any source which occur though ordinary diligence is employed <u>shall be allowed</u>" so long as: (1) the best operational practices to reduce emissions were used; (2) pollution control equipment was operated properly; and (3) "the duration of excess emissions [was] minimized." Ga. Comp. R. & Regs. 391-3-1-.02(2)(a)7(i) (emphasis added).[7]

## B.     The SSM Condition in Plant Wansley's Permit

Plant Wansley's Title V permit, which became effective on January 1, 2000, also contains an SSM provision.  Although the SSM condition in Plant Wansley's permit is derived from the state-wide SSM Rule, the SSM condition is phrased slightly differently.[8]

---

[7]The Georgia SSM rule reads in its entirety (with emphasis added):

7. Excess Emissions:
(i) <u>Excess emissions resulting from startup, shutdown, malfunction</u> of any source which occur though ordinary diligence is employed <u>shall be allowed</u> provided that (I) the best operational practices to minimize emissions are adhered to, and (II) all associated air pollution control equipment is operated in a manner consistent with good air pollution control practice for minimizing emissions, and (III) the duration of excess emissions is minimized.
(ii) Excess emissions which are caused entirely or in part by poor maintenance, poor operation, or any other equipment or process failure which may reasonably be prevented during startup, shutdown or malfunction are prohibited and are violations of this Chapter (391-3-1).
(iii) The provisions of this paragraph 7. shall apply only to those sources which are not subject to any requirement under section (8) of this Rule (i.e. Rule 391-3-1-.02) or any requirement of 40 CFR, Part 60, as amended, concerning New Source Performance Standards.
Ga. Comp. R. & Regs. 391-3-1-.02(2)(a)7(i).

[8]For clarity, in this opinion the "SSM Rule" refers always to the Georgia SSM rule of general applicability that appears in the Georgia SIP.  The "SSM condition" refers always to the

10

The SSM condition in Plant Wansley's Title V permit states that "[t]he Division [i.e., Georgia EPD] may allow excess emissions in certain cases as described below." [Permit Condition 8.13.1] (emphasis added). The permit then repeats the relevant language from the Georgia SSM Rule, stating that "[e]xcess emissions resulting from startup, shutdown, [or] malfunction of any source which occur though ordinary diligence is employed shall be allowed" provided that: (1) the best operational practices to reduce emissions were used; (2) pollution control equipment was operated properly; and (3) "the duration of excess emissions [was] minimized." [Permit Condition 8.13.1.a] (emphasis added).[9]

_____

similarly worded SSM provision from Plant Wansley's Title V permit.

[9] The SSM condition in Plant Wansley's permit reads in its entirety (with emphasis added):

> 8.13 Excess Emissions
> 8.13.1 The Division [i.e. Georgia EPD] may allow excess emissions in certain cases as described below.
>> a. Excess emissions resulting from startup, shutdown, malfunction of any source which occur though ordinary diligence is employed shall be allowed provided that:
>> [391-3-1-.02(2)(a)7(i)]
>>> i. The best operational practices to minimize emissions are adhered to;
>>> ii. All associated air pollution control equipment is operated in a manner consistent with good air pollution control practice for minimizing emissions; and
>>> iii. The duration of excess emissions is minimized.
>> b. Excess emissions which are caused entirely or in part by poor maintenance, poor operation, or any other equipment or process failure which may reasonably be prevented during startup, shutdown or malfunction are prohibited and are violations of this Permit.
>> [391-3-1-.02(2)(a)7(ii)]

11

## C.  District Court's Order

The district court concluded that even if the exceedances at Plant Wansley occurred during SSM, this fact offers Georgia Power no defense against Sierra Club's lawsuit.  Sierra Club v. Georgia Power Co., 365 F.Supp.2d 1297, 1304-05 (N.D. Ga. 2004).  Georgia Power conceded that the exceedances took place, and therefore the district court's SSM decision led the court to grant partial summary judgment in Sierra Club's favor.  Id. at 1308-09.  Because the district court found categorically that Georgia Power could not raise an SSM defense, the district court did not evaluate whether any or all of the 4,000 alleged exceedances occurred during SSM.[10]

The district court's opinion focused on the SSM condition in the Plant Wansley permit, and in particular on its opening language stating that "the [EPD] may allow excess emissions in certain cases as described below."  Id. at 1305.  In the district court's view, "the condition's plain language limits it to what EPD

---

c.  Paragraphs (a) and (b) of this condition shall not apply if precluded by any other State or Federal regulation or elsewhere in this permit. [391-3-1-.02(2)(a)7(iii)]

[10]There is no claim in the complaint or issue on appeal regarding whether Plant Wansley must report all emissions, as opposed to reporting only emissions in excess of its permit limits.  Rather, the narrow issue on appeal is solely whether the excess emissions which Plant Wansley did report to the EPD constitute Clean Air Act violations as a matter of law.  We thus review only whether Georgia Power, as a matter of law, is precluded from raising an SSM defense to the alleged violations based on the SSM provision in the Georgia Rules and in Plant Wansley's Title V permit.

12

'may allow . . . in certain cases.'" Id.  In other words, the district court accepted Sierra Club's position that because the SSM condition refers explicitly to the EPD (and not to citizen enforcers), it does not offer Georgia Power a defense where the allegations of opacity violations are raised in a citizen enforcement action.

Upon motion by Georgia Power, the district court certified its liability ruling for interlocutory appeal.  See 28 U.S.C. § 1292(b).  We subsequently granted Georgia Power's petition for leave to appeal the partial summary judgment order. Id.

### III.  Discussion

As quoted earlier, Georgia's SSM Rule, approved by the EPA, states that SSM violations "shall be allowed" provided three conditions are met.  Ga. Comp. R. & Regs. 391-3-1-.02(2)(a)7(i).  The SSM rule is categorical and unambiguous. The SSM Rule does not limit the SSM defense to actions initiated by the EPD, but simply provides a potential defense to alleged violations where the emissions exceedances at issue occur during SSM.  Quite clearly, the SSM Rule applies to any enforcement action, whether initiated by the EPD or, as in this litigation, by a private citizen.

Despite the straightforward language in Georgia's SSM Rule, Sierra Club contends that Georgia Power nonetheless cannot invoke the SSM Rule as a defense

in this action. We address each of Sierra Club's arguments and why the district court erred in adopting Sierra Club's position.

## A. EPA's Current SSM Policy Does Not Revoke Georgia's SSM Rule

Sierra Club's first argument is that Georgia Power may not invoke Georgia's SSM Rule as a defense because Georgia's SSM Rule provides a broader SSM defense than now allowed by the EPA. The district court agreed, giving particular weight to the EPA's 1999 Guidance policy on SSM provisions. Sierra Club v. Georgia Power Co., 365 F.Supp.2d at 1304-06.

The EPA's 1999 Guidance provides that SIPs may include only very narrow affirmative defenses for SSM exceedances and may not automatically exempt SSM emissions from enforcement. State Implementation Plans: Policy Regarding Excess Emissions During Malfunctions, Startup, and Shutdown, Memorandum from Steven A. Herman, Assistant Adm'r for Enforcement and Compliance Assurance, to Reg'l Adm'rs (Sept. 20, 1999) (the "1999 Guidance"). It is clear that Georgia's SSM Rule creates a broader SSM defense than that described in the 1999 Guidance.[11] Even so, Sierra Club's reliance on the EPA's 1999 Guidance is

---

[11]The 1999 Guidance is founded on the EPA's reading of § 110 of the Clean Air Act, 42 U.S.C. § 7410. The 1999 Guidance asserts that the EPA cannot approve SIPS that include SSM provisions that "would undermine the fundamental requirement of attainment and maintenance of the national ambient air quality standards." 1999 Guidance, at 2 (citing 42 U.S.C. § 7410(a)).

As such, the 1999 Guidance first advises that it is the EPA's policy that "any [SIP] provision that allows for an automatic exemption for excess emissions is prohibited." 1999 Guidance (Attachment) (footnote omitted). As for affirmative SSM defenses, the 1999

14

misplaced.

The first reason Sierra Club's argument fails is that its position is utterly at odds with the EPA's 2001 Clarification of its SSM policy. See Memorandum from Eric Schaeffer, Dir., Office of Regulatory Enforcement, to Reg'l Adm'rs (Dec. 5, 2001) (the "2001 Clarification"). The 2001 Clarification explains that the EPA's 1999 Guidance "was not intended to alter the status of any existing [SSM] provision in a SIP that has been approved by EPA. Similarly, the [1999] Guidance was not intended to affect existing permit terms or conditions regarding [SSM] that reflect approved SIP provisions, including opacity provisions." Id. at 1. By the clear terms of the 2001 Clarification, even assuming that the EPA is now opposed to SSM defenses as broad as Georgia's SSM Rule, the EPA's policy was only meant to apply prospectively, "in the context of future rulemaking actions." Id. at

_____

Guidance allows states to include affirmative defenses for SSM exceedances, but only where the affirmative defense is extremely narrow. The 1999 Guidance explains generally that "states may address [SSM exceedances] through the use of enforcement discretion or they may include a general affirmative defense provision in their SIPs for short and infrequent startup and shutdown periods along the lines in the attachment." 1999 Guidance at 4. According to the 1999 Guidance, "an acceptable [SSM] affirmative defense provision may only apply to actions for penalties, but not to actions for injunctive relief." 1999 Guidance at 2.

The 1999 Guidance then explains in detail how a state should tailor an SSM affirmative defense provision narrowly enough for EPA approval. An affirmative defense applicable to malfunction periods "must provide that the defendant has the burden of proof of demonstrating" that ten specific conditions are met. 1999 Guidance (Attachment). An affirmative defense applicable to startup and shutdown periods "must provide that the defendant has the burden of proof of demonstrating" that nine specific conditions are met. Id.

In contrast to the 1999 Guidance, Georgia's SSM Rule includes only three conditions and is not limited to actions for penalties, and thus is broader than the SSM provisions described in the 1999 Guidance.

15

2.

For this reason, the Sixth Circuit decision on which the district court heavily relied, Mich. Dep't of Envtl. Quality v. Browner, 230 F.3d 181 (6th Cir. 2000), is largely irrelevant. In that case, Michigan sought EPA approval for a SIP revision, one that included a new SSM provision. Id. at 183. Although the EPA rejected Michigan's SSM provision, it did so during the SIP approval process, i.e. "in the context of future rulemaking." See id. at 184; 2001 Clarification at 2. In contrast, Georgia's SSM Rule has been in place since 1980, and the 2000 approval of Plant Wansley's Title V permit did not in any way alter the general SSM provision in the Georgia SIP.[12]

Second, even if the EPA had intended its 1999 SSM policy to alter the meaning of Georgia's existing SSM Rule and similar provisions in other states'

---

[12]Indeed, the EPA has stated specifically that the Georgia SSM Rule remains in effect regardless of the 1999 Guidance and with respect to an SSM condition identical to that in Plant Wansley's Title V permit. See Monroe Power Co., at 13.

Monroe Power's Title V permit includes the identical SSM condition that appears in Plant Wansley's permit. After the EPD approved a draft of Monroe Power's permit, Sierra Club and other public interest groups petitioned the EPA to object to it. Id. at 1. Sierra Club asked the EPA to clarify the SSM condition in Monroe Power's permit, reminding the EPA of its policy prohibiting automatic SSM exemptions.

In Monroe Power, the EPA agreed with Sierra Club that automatic SSM exemptions would no longer be approved, but the EPA also explained that its 1999 SSM policy was not meant to "alter the status" of existing and approved SSM provisions. Id. at 14 ("EPA cannot properly object to a . . . permit term that is derived from a federally approved SIP. . . . [EPA] may not, in the context of reviewing a potential objection to a title V permit, ignore or revise duly approved SIP provisions."). Thus, the 1999 Guidance neither altered nor invalidated the pre-existing Georgia SSM Rule.

16

SIPs, the EPA would have been powerless to effect such a change absent formal SIP revision. Georgia's SSM Rule is a part of the Georgia SIP adopted by Georgia and approved by the EPA through the formal rulemaking process prescribed in the Clean Air Act. See 42 U.S.C. § 7410(a)(1). In contrast, the EPA's 1999 Guidance concerning SSM provisions is not a regulation and is not due the same level of deference as formally adopted rules. United States v. Mead Corp., 533 U.S. 218, 229-31, 121 S. Ct. 2164, 2172-73 (2001). EPA policy guidance cannot trump the SSM Rule adopted by Georgia and approved formally by the EPA.

If the EPA believes that its current interpretation of the Clean Air Act requires Georgia to modify its SSM Rule, the EPA should require the state to revise its SIP to conform to EPA policy. See 42 U.S.C. § 7410(k)(5) (outlining the "SIP call" procedure under which EPA may notify a state of SIP inadequacies and require the state to submit a revised plan). Because the EPA has not done so, Georgia's SSM Rule remains in effect regardless of the EPA's currently espoused policy. See 42 U.S.C. § 7410(n)(1) ("Any provision of any applicable implementation plan that was approved or promulgated [before November 15, 1990] shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the [EPA] Administrator pursuant to this chapter.").

17

Accordingly, considered without reference to Plant Wansley's Title V permit, the SSM Rule of state-wide applicability clearly offers Georgia Power an affirmative defense to Sierra Club's enforcement action, which Georgia Power may attempt to prove.[13] Because Plant Wansley's permit and the SSM condition therein did not become effective until January 1, 2000, at the very least the district court erred in precluding Georgia Power from raising an SSM defense to the violations alleged before that date.

## B.    Plant Wansley's Permit Simply Restates the SSM Rule

Given that Georgia's SSM Rule clearly allows Georgia Power to raise an SSM affirmative defense, Sierra Club alternatively focuses not on Georgia's SSM Rule, but rather on the SSM condition in Plant Wansley's Title V permit. Sierra

---

[13]We also reject Sierra Club's alternative argument that Georgia's SSM Rule does not apply to Plant Wansley at all.

Georgia's SSM Rule does not apply to "sources" that are subject to the Clean Air Act's "New Source Performance Standards" ("NSPS"). See Ga. Comp. R. & Regs. 391-3-1-.02(2)(a)7(iii). Plant Wansley's Unit 5A (a gas-fired generating unit) is subject to NSPS, and the SSM Rule therefore does not apply to Unit 5A. However, Plant Wansley's Units SG01 and SG02 (the two coal-fired units at issue) are not subject to NSPS. See Br. of Appellee, at 53  (acknowledging that Unit 5A is subject to NSPS but SG01 and SG02 are not). As such, Georgia's SSM Rule applies to the exceedances alleged at SG01 and SG02.

Sierra Club is correct that the entire Plant Wansley is a single "major stationary source." See Sierra Club v. Leavitt, 368 F.3d 1300, 1302 n.1 (11th Cir. 2004). Even so, a "major stationary source" may encompass numerous "sources." 42 U.S.C. § 7661(2); see also EPA's response to Sierra Club's Comments on Georgia's Title V program, Mar. 29, 2002, at 2 (noting that "it is not uncommon to have both NSPS and non-NSPS emission sources at the same facility"). Thus Georgia's SSM Rule applies to SG01 and SG02 regardless of the fact that it does not apply to Unit 5A. See also Compl. ¶ 24 (stating that Unit 5A "is not the subject of this lawsuit").

Club argues that the permit's language, which differs slightly from the wording of Georgia's SSM Rule, does not allow Georgia Power to raise the SSM defense.

Sierra Club emphasizes that although the SSM condition restates the SSM Rule by providing that SSM exceedances "shall be allowed," the SSM condition also adds the introductory statement that "the <u>Division may</u> allow" SSM exceedances. [Permit Condition 8.13.1] (emphasis added). For two reasons, Sierra Club contends that this introductory phrase greatly narrows the scope of the SSM Rule with respect to Plant Wansley.

First, because the introductory phrase focuses on what "the Division" (i.e. EPD) may do, Sierra Club asserts that the SSM condition only applies to agency enforcement, making the SSM defense unavailable in a citizen enforcement action. <u>Sierra Club v. Georgia Power Co.</u>, 365 F.Supp.2d at 1304-05. Second, Sierra Club contends that the use of the word "may" in Plant Wansley's permit, in reference to what the EPD "may allow," should be construed as "merely an acknowledgment of EPD's enforcement discretion." <u>Id.</u> Sierra Club reasons that construing the SSM condition as merely an expression of EPD's discretion would ensure consistency between Plant Wansley's Title V permit and the EPA's 1999 Guidance. <u>Id.</u>

One obvious problem with Sierra Club's reading of the SSM condition's "the Division may allow" clause is that it renders the entire SSM condition

19

completely superfluous. If the SSM condition simply expresses that the EPD has enforcement discretion, the SSM condition is essentially meaningless. It goes without saying that the EPD, like any administrative agency, may choose whether and when to initiate any enforcement action. Sierra Club's interpretation effectively reads the SSM Rule out of Plant Wansley's permit entirely.

In any event, we do not agree that the SSM condition's minor alteration of the wording of the SSM Rule was intended to transform the general affirmative defense provided by Georgia's SSM Rule into a narrow statement of the EPD's enforcement discretion.[14] Instead, by the permit's explicit terms, the SSM condition is a restatement of the general SSM Rule. See Permit Condition 8.13.1.a (citing Ga. Comp. R. & Regs. 391-3-1-.02(2)(a)7(i) – the SSM Rule – as the source of the permit's SSM condition). After the words "the Division may allow," the SSM condition quotes the rest of the SSM Rule nearly verbatim, stating that emissions during SSM "shall be allowed" provided that three conditions are met.

We thus read the SSM condition in Plant Wansley's permit to restate that where a stationary source can demonstrate that it meets the listed criteria, exceedances during SSM "shall be allowed." Our interpretation is confirmed by

---

[14]To clarify its intent in the wake of this lawsuit, the EPD has apparently begun amending the SSM condition in affected Title V permits to eliminate the introductory phrase "the Division may allow" to make it clearer that the SSM condition does not alter the SSM Rule. See Br. of Appellant at 36 n.14.

20

the fact that, as discussed above, a Title V operating permit is not intended to impose additional requirements on a source. Rather, the permit merely consolidates in a single document all of the clean air requirements already applicable to that source. See Leavitt, 368 F.3d at 1302 (citing 42 U.S.C. § 7661a(a); 40 C.F.R. §§ 70.7(b), 70.6(a)(1)). Because Sierra Club's interpretation of the SSM condition is narrower than the SSM Rule, Sierra Club's reading is inconsistent with the Title V program itself. See id. at 1302-03 (stating that SIP requirements remain binding regardless of a Title V permit).

We conclude that the SSM condition in Plant Wansley's Title V permit simply restates Georgia's SSM Rule. The SSM Rule and the SSM condition are consistent, and we reject Sierra Club's attempt to construe Plant Wansley's permit to have effectively amended Georgia's SSM Rule.[15]

---

[15]Sierra Club admits that under its construction of the SSM condition, Plant Wansley's permit is more stringent than the Georgia SIP requires. However, Sierra Club contends that Georgia Power is "stuck with" the SSM condition as it appears in the Plant Wansley permit. Sierra Club insists that even if the SSM Rule provides a broader affirmative defense than the SSM condition, that fact is simply irrelevant to this lawsuit. In Sierra Club's view, Georgia Power cannot invoke the SSM Rule without launching an unlawful collateral attack on the Plant Wansley permit.

Sierra Club is correct that a Title V permit holder may not argue in an enforcement action that the permit is invalid or unenforceable. See 42 U.S.C. § 7607(b)(2). At the time the Plant Wansley permit was considered, Georgia Power had the opportunity to object to the SSM condition in the permit through the Georgia administrative process, or by petitioning the EPA requesting that the EPA object to the permit. See O.C.G.A. §§ 12-2-2(c)(2), 12-9-15; Ga. Comp. R. & Regs. 391-1-2-.03(1); 42 U.S.C. § 7661d(b)(2). Georgia Power can no longer attack the permit for being too strict. See 42 U.S.C. § 7607(b)(2). Thus, Sierra Club is correct that Georgia Power may not collaterally attack its permit in this lawsuit.

However, Georgia Power is not collaterally attacking its Title V permit. Rather, Georgia

21

## IV. Conclusion

In sum, we reverse the district court's entry of partial summary judgment in favor of Sierra Club, and remand for further liability proceedings consistent with this opinion. On remand, Georgia Power should be allowed to raise an affirmative SSM defense to the exceedances alleged by Sierra Club. Of course, Georgia Power will be required to prove that the three criteria in Georgia's SSM Rule and the permit's SSM condition are satisfied for each instance of exceedance.[16]

Ultimately, it appears that Sierra Club's real complaint is not with Georgia Power's permit compliance, but rather with Georgia's SSM Rule itself. Even with our holding today, Sierra Club remains free to challenge Georgia's SSM Rule as contrary to the Clean Air Act. In particular, Sierra Club could petition the EPA for rulemaking, asking the EPA to demand that Georgia alter its SIP to conform to the EPA's SSM policy.[17] See 5 U.S.C. § 553(e) (Administrative Procedure Act's petition-for-rulemaking clause); Monroe Power Co., at 14 (explaining that "[a]s

---

Power is contending – correctly, in our view – that the SSM condition means the same thing as the SSM Rule. Where Sierra Club's argument fails is in its exclusive focus on the SSM condition and its failure to interpret the SSM condition and the SSM Rule together.

[16]Although we conclude that Georgia Power may raise an SSM affirmative defense, we have no occasion to rule on whether Georgia Power can prove that defense with respect to any or all of the exceedances alleged in the complaint to violate the Clean Air Act.

[17]At oral argument, Sierra Club's counsel averred that Sierra Club has already initiated such action.

with any rulemaking, [Sierra Club] is free to file an administrative petition with EPA requesting that the Agency require Georgia to revise the [SSM] rule"). For purposes of this particular enforcement action, however, Georgia's SSM Rule remains the law, and the SSM condition in Plant Wansley's Title V permit must be read accordingly. See, e.g., Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n, 366 F.3d 692, 703 (9th Cir. 2004) (citizens may not seek modification of a SIP through a citizen suit enforcement action).

**REVERSED and REMANDED with instructions.**